Allen Scott **RUSSELL**, Appellant,

v.

**STATE of Texas, Appellee.**

No. 11–87–068–CR.

Court of Appeals of Texas, Eastland.

Feb. 4, 1988.

David Adkins, Bradbury, Tippen, Rollins, Adkins & Hamilton, Abilene, for appellant.

James Eidson, Crim. Dist. Atty., Abilene, for appellee.

## OPINION

DICKENSON, Justice.

The jury convicted Allen Scott Russell of aggravated robbery,[1] found that the allegation of a prior felony conviction was true,[2] and assessed his punishment at confinement for a term of 99 years. We reform the judgment of the trial court by deleting the enhancement finding and affirm the conviction.[3]

Appellant presents three points of error. There is no challenge to the sufficiency of the evidence as to the jury's verdict that he committed an aggravated robbery in Taylor County on November 27, 1984. The victim was a clerk in a convenience store who was shot and wounded after opening the store's floor safe and yielding up the money.

The first point charges that the State failed to prove the finality of the conviction which was alleged to enhance the punishment. The State agrees that appellant is correct as to this contention;[4] however, the State argues that this error was harmless under the facts of this case. We agree. TEX.R.APP.P. 81(b)(2) states that when error is found in the trial court proceedings:

> [T]he appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

In this case, the conviction occurred before the error was made, and the record is clear that the error did not contribute to the 99-year sentence which was assessed. Evidence of this conviction was admissible during the punishment phase without regard to whether the appellate proceedings were final. See TEX.CODE CRIM.PRO.ANN. art. 37.07, sec. 3 (Vernon Supp.1988). As noted in footnote 2, the error affected only the minimum period of confinement which could have been assessed. The record is clear that the jury was not considering the minimum sentence [neither the 5 year nor the 15 year minimum]. The State was arguing for a life sentence. Appellant's attorney told the jury:

> I am not going to stand up here and argue to you to go back there and set the minimum punishment. I suggest to you, ladies and gentlemen, that what is appropriate, in this case, as to this defendant, Allen Russell, based on your verdict and what you must have found his participation in the aggravated robbery to be, that what is appropriate for him, I sub-

---

1. See TEX.PENAL CODE ANN. sec. 29.03 (Vernon 1974) which defines the offense and declares it to be a felony of the first degree.

2. The punishment for a felony of the first degree was enhanced pursuant to TEX.PENAL CODE ANN. sec. 12.42(c) (Vernon Supp.1988) by proof of one prior felony conviction, raising the minimum term of imprisonment from 5 to 15 years. There was no change in the maximum authorized term of imprisonment [life or 99 years] or in the fine [not to exceed $10,000].

3. Appellant's first conviction for this offense was reversed by this Court because of harmful error in the admission of proof that he failed to pass a polygraph examination. *Russell v. State,* No. 11–85–154–CR (Tex.App.—Eastland, February 20, 1986, pet'n ref'd) (not published). After the first jury convicted appellant, the trial court assessed his punishment at confinement for life.

4. Pursuant to TEX.R.APP.P. 80(b)(2), we reform the judgment to delete the enhancement finding.

mit to you, ladies and gentlemen, is some term of years not in excess of 25 years. See also *Swoape v. State*, 658 S.W.2d 600 (Tex.Cr.App.1983), where the Court of Criminal Appeals came to the same conclusion even before the adoption of Rule 81(b)(2). Appellant admitted in his confession that he shot the elderly store attendant after he opened the safe and gave the money to appellant as instructed. Appellant also admitted that he "tried to shoot at him again, but the gun didn't go off." The jury knew that appellant had two prior felony convictions.

Next, appellant argues that the trial court erred in failing to suppress his statements [dated November 28, 1984, and December 4, 1984] on the basis that they were not voluntarily made. Omitting the introductory paragraphs [containing the statutory warnings pursuant to TEX.CODE CRIM.PRO.ANN. art. 38.22, sec. 2 (Vernon 1979)] and the signatures of appellant and the witnesses, these statements read in full as shown:

## STATEMENT DATED NOVEMBER 28

My name is ANDY SCOTT RUSSELL, I am 22 (twenty-two) years of age and I live at 3125 Sandefer in Abilene, Taylor County Texas.

On Monday, November 26, 1984 at approximately 11:00 AM, I was at Donald Battles's house. With me was Joe Walker, Dennis Smith, and two other guys who I do not know their names. We were sitting around getting high on some grass. Donald Battles began talking about some robberies. He said he had to get some money one way or another. Joe Walker said, "Say man, I got a piece." Dennis Smith said, "You ain't gonna do nothing." They then quit talking about robberies.

On Tuesday, November 27, 1984 at about 9:05 PM, I walked to Donald Battles's house. Donald said, "Say man, we're gonna do some robberies tonight." I said with what. Donald said he knew somebody that had a piece. I said who. Donald said Joe Walker. We stayed around Donald's house for a while be-cause Dennis Smith was supposed to be in on it too. Dennis didn't show up. Donald said, "Hey man, let's go on." Donald and I walked from his house to Joe Walker's house. Donald made me wait three houses down from Joe's house until he got Joe. Joe Walker, Donald Battles, and I then started walking towards Ambler. Donald showed me a .25 caliber automatic pistol, black and silver in color. We walked on Burger Street to where we could see a liquor store. Joe and Donald tried to talk me into hitting the liquor store. I told them no, and they began calling me names. Joe and Donald walked to the back of the Fina Station at Ambler and Burger. I was walking towards Alsups in a field. I turned around and started watching the station. A blue truck drove up to the station and got something and left. A few seconds later, the lights to the Fina Station went out. I saw Donald Battles run around the side of the station and go into the station. I didn't see Joe go into the station. I then heard a gunshot and saw a flash. I then took off running down Ambler across Mockingbird to my house. I waited at my house, and about ten minutes later, Donald Battles knocked on my door, and I let him in. Donald said we did it, and handed me about $230.00. We stayed at my house for a little and celebrated. We walked down my street going to Abilene North Apartments. Donald still had the gun with him. We went to a girl's house to get a ride. She said someone was using her car to get some weed. We left her her house and went to another girl's house. She gave us a ride to get some weed. On the way, the Police stopped us at the girl's momma's house. I was arrested and Donald took off running.

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

STATEMENT DATED DECEMBER 4

My name is ANDREW SCOTT RUS-SELL, I am 22 years of age and I live at 3125 Sandefor in Abilene Taylor County Texas.

On Tuesday, 11–27–84, at about 8:30 p.m., I was at my house watching the "A" Team. I got up and wired myself up on Crystal. I then walked over to Donald Battles's house. Battles and I then started talking about doing us a robbery. Dennis Smith was supposed to help us and also had a gun. Dennis didn't show up. Battles said we could get a gun from Joe Walker. We then walked to Joe Walker's on the 1600 block of Fannin. Joe Walker had a chrome plated .25 automatic pistol. Battles was playing with the gun and it only had three bullets. We walked to Ambler and Burger because I said I wanted to rob the Fina Station at Ambler and Burger, Donald Battles and Joe Walker told me to rob the liquor store across the street from the Fina because they knew that place had some money. I told them I wasn't going to do it because I was going to rob the Fina Station. We all three then walked behind the Fina. Battles and Walker was going to kill the lights from the power outlet on the back of the building. Battles gave me the gun and some gloves and a stocking mask. I gave Battles my Abilene High Letter Jacket and my beige cap. I put on the gloves and the mask. I then walked to the side of the station. Battles said when the lights go off you hit him. The lights went off. I ran around to the front and entered the station. I told the clerk "Give me the money". He said I don't have any money. I said you're a lier. He said it's put up. Then I searched the cash register. I said man you better give my the money or I'm gonna pop you. He told me to hold on I've got to find my key. He found the key and got on his knees and opered the safe. He said here's the money. I asked him what else was in the safe. He said nothing, you wanted the money and here it is. I snatched it. Then I started walking off and he reached down like he was going to grab something. I said you shouldn't have never done that. *I then shot him. He stood up like the bullet missed him. I tried to shoot at him again but the gun didn't go off.* I left the station running towards my house. I got across the street and threw the gloves and mask down. I dropped the money bag. I picked it up and put it under my shirt. I then ran to the back yard of my house. I went into my house to my room. About five minutes later, Battles came knocking on my door. He said did you do it? I said yes man, but I shot him. He said that's OK. He then said where's the money. I took the money bag from under my shirt and showed him the money. Battles took the money out of the bag and threw the bag somewhere. Then Battles asked me for the gun. I said no you can't have it, I used it and I'm keeping it. Battles said no man, it's not my gun. I then pointed the gun at him and said Nigger I will do you the same way. I said you don't believe me, try me. He said calm down, we're going to get all this settled, calm down, and please give me the gun. I said man I'm not giving you the gun, I'm keeping it because if the Police stop me I'm shooting them too. Battles said I'll shoot them. I said bullshit. He said no man I will shoot them, I promise. I gave Battles the gun. We started walking towards Battle's house. I saw a car light and I took off running. I ran to Battles's house. A few minutes later, Battles showed up. We went in the house and split the robbery money up. We left Battles house and went to a girl's house to get a ride. The girl said her car was not home. We then went to another girl's house and she gave us a ride. We drove to Mimosa and Vogel and at the intersection a Detective shined a bright light on us. Battles told the girl to drive to her momma's house on Vogel. Battles got out of the car and took off running. The Police showed up and arrested me. (Emphasis added)

I have read this statement of my rights and I understand what my rights

are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

The record shows that appellant was known as "Allen Scott Russell," "Andy Scott Russell," and also as "Andrew Scott Russell."

Abilene Police Officer Johnny Snow testified that he took both statements from appellant. The first statement was taken on the night of the robbery. After appellant had been arrested and taken to the City Jail, Officer Snow had him brought upstairs to the Criminal Investigation Division's offices. Officer Snow testified that he warned appellant fully of all of his rights and that appellant began talking to him about what had happened. The statement was reduced to writing and then typed and signed. Officer Snow said that appellant read the statement out loud to him and the witness before signing it.

The first statement claims that Donald Battles and Joe Walker committed the robbery and that appellant did not participate in the robbery. After this statement was shown to Donald Battles, Battles gave a statement which apparently named appellant as the one who shot the attendant.

Officer Snow then talked to appellant on December 4, confronted him with what Battles had said, and secured the second confession. Officer Snow testified that he again warned appellant of his rights fully and that appellant agreed to talk to him, giving the second statement which was written down, then typed, read aloud, and signed by appellant. Officer Snow testified that appellant did not ask for an attorney and did not ever say that he did not want to talk. Officer Snow testified that appellant was not coerced, nor forced to talk, nor threatened in any way, and that no promises or inducements were made in connection with either of these statements.

■ We hold that the trial court did not err in refusing to suppress these statements. See, e.g., *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Phillips v. State*, 701 S.W.2d 875 at 890 (Tex.Cr.App.1985); *Bonham v. State*, 680 S.W.2d 815 at 822 (Tex.Cr.App.1984); *Barton v. State*, 605 S.W.2d 605 at 607 (Tex.Cr.App.1980). The trial court was not required to accept as true the statement by appellant's witness that appellant was deprived of cigarettes and telephone privileges unless and until he talked. Even if the court accepted that testimony as true, the trial court was not required to conclude that this would have been sufficient to make either statement involuntary. The fact that appellant voluntarily took and failed a polygraph examination before giving the second statement does not make the statement involuntary.

In his third point, appellant argues that the trial court committed reversible error in overruling his motion for mistrial after the State asked Officer Snow about appellant's oral statement when he was shown the gun which was used in the robbery. This portion of the record reads as shown:

Q: For what purpose or reason did you show the gun to Russell?

A: To see if it was the same gun used in the robbery.

Q: What did he tell you when you showed it to him?

A: He said that—

DEFENSE COUNSEL: Your Honor, objection to what was said as not being in compliance with Article 38.22 of the Code of Criminal Procedure.

THE COURT: Sustained.

DISTRICT ATTORNEY: Q: At that point, Officer Snow, did you know whether this gun was connected to this case or not?

THE WITNESS: A: Prior to asking him—Mr. Russell?

Q: Right. In other words, you found a gun. Did you know whether it was connected to this case or not?

A: No, sir, I did not.

Q: Did you know after you talked to him?

A: Yes, sir.

DEFENSE COUNSEL: Your Honor, same objection.

DISTRICT ATTORNEY: Your Honor, I think it goes to the fruits, that the statement that—

DEFENSE COUNSEL: Your Honor, may we have a hearing on this outside the presence of the jury?

THE COURT: I think so.

Ladies and gentlemen, why don't you all take you about a ten or a fifteen-minute recess. We will carry on in here for a minute, then we will take a short recess ourselves.

\* \* \* \* \* \*

THE COURT: Ladies and gentlemen, prior to recessing, the district attorney had made an inquiry of this witness concerning whether he had asked the accused individual here, this defendant, a certain thing while he was in custody of the police. Our rules provide that if it is not reduced to writing and put in writing, that it is inadmissible. The district attorney has withdrawn his question, and I instruct you to disregard the question that was asked. Certainly—I personally don't recall an answer being made by the witness. If any answer was made or attempted to be made by the witness to the question, disregard the answer, if any, you heard, also. Don't consider either the question or any possible answer that he may have given to that question for any purpose whatsoever in connection with this case or during your deliberations.

█ We hold that the trial court's instruction to disregard was sufficient to cure any error which otherwise might have been present. See, e.g., *Coe v. State*, 683 S.W.2d 431 at 436 (Tex.Cr.App.1984). The third point is overruled.

The judgment of the trial court is reformed [by deleting the enhancement finding] and affirmed.